for the second district is now open. The Honorable Justice Robert D. McLaren presiding, along with Justices Mary S. Shostak and Joseph E. Burkett. The case is number 219-0598, People of the State of Illinois, Plaintiff-Appellee v. Michelle C. Leader, Defendant-Appellant. Arguing for the Appellant, Phyllis J. Perko. Arguing for the Appellee, Lynn Harrington. Thank you. Is it 10 minutes? 10 minutes and 5? 15, 15 and 5, Judge. 15, 15 and 5. Thank you. You may proceed, Ms. Perko. The situation arose from Michelle having given statements to police during police questioning after she was found wandering in a closed area of a conservation district. We present two arguments on appeal. The first, that the offense was not proven guilty, excuse me, that the offense was not proven beyond a reasonable doubt. And secondly, that the statute in question is unconstitutional as applied by reason of violating the First Amendment protection of free speech. With reference to our reasonable doubt argument, there are four elements of this offense and we challenge two of the elements or the sufficiency of the proof regarding two of the elements. We admit the elements that false statements were made and that false statements were made to the police. Those are two of the elements. The other two elements are that the statements be a report and that that report be transmitted. So we argue that the statements do not amount to a report within the meaning of the statute and that any other conduct does not amount to a transmittal of a report. The information or the statements that... Perko, are you submitting that the transmission had to be made by the defendant, not someone on her behalf? Under the circumstances of this case, we would argue that. I mean, certainly if there were a direction to a third party to transmit a report, we would acknowledge that to be a different situation than this situation. But in this case, the only other persons involved in the supposed transmission are actually the police themselves.  Well, he was not present. I don't believe in the hospital room at any point when these statements were made so that the statements were made in roughly a one hour period. While Michelle was in the hospital and undergoing observation and possibly treatment, the testimony was that she was hooked up to medical devices during the time the statements were given. There is a reference... The statements that were given, her account of what occurred, were given freely and voluntarily. There is no... You're not arguing that she was coerced into making those statements, are you, or forced? No, we are not raising any type of a voluntariness argument. But what you're stating is that the police officers were complicit in doing their job. By doing their job, by investigating this report, that they are the ones that initiated everything. But weren't they just doing their job? Weren't they just following up on what was reported to them? Absolutely, they were doing their job. Reported to them by her and by, I think his last name was a Collins, the man who found her. She told him she was kidnapped and then he called the police. So how does that make her not complicit in this string? Well, the reason that is not a report, that conversation that she had with the conservation personnel is because she specifically asked that the matter not be reported to the police and simply that she referred to the person as her father, that her father be contacted. In fact, that man apparently is the father of her boyfriend. But in any event, she specifically asked that the police not be notified. Would you agree that the conversation with Mr. Collins, the defendant revealed a very serious offense or a series of offenses, kidnapping, being held hostage in a darkened basement. Isn't it the responsibility of every citizen, regardless of whether or not the victim requests a report, that the citizen report serious crimes? We're not faulting Mr. Collins or the police for doing what would probably be their jobs. I mean, it probably would be the job of the conservation employee to report strange occurrences on the premises. He was resident on the, he and his wife were resident on the premises. As a reasonable person, any person reporting a serious offense, the expectation of anybody who is the victim would be that somebody else is going to report, regardless of whether or not you request, like child abuse. A child is abused, tells his or her parents or a friend, but then says, don't tell because I love the abuser. The expectation is not that somebody is going to remain silent. A reasonable person is going to report that offense, correct? Well, a reasonable person might, but the circumstances that Michelle found herself in would not necessarily indicate that she was a reasonable person at that time. I mean, the evidence is that she was distraught or upset to some extent. So it may well be that that would be the expectation of a reasonable person. I don't know that the evidence establishes that she was a reasonable person at the time and place in question. Well, you didn't raise an insanity defense. No, there's no insanity defense. Let's move to when they get to the hospital and she starts answering their questions at the hospital. Could she not have just refused to answer the questions? She absolutely could have refused to answer the questions, but she cooperated with police. Right. And going back to Collins, I hate to flip back and forth, but going back to him, she could have said, hey, I'm lost, as opposed to saying I was kidnapped, right? Justice Burkett said he wouldn't have felt compelled to report this horrific crime, but she didn't. That's correct. So she perpetrated this lie, right? Well, she is convicted of conduct that happened in the hospital room. She is convicted of making statements to the police and one of the specific two police who were present in the hospital room. So while we can look at some of the conduct that happened before that, before those actions that constitute the crime, her statements to Collins or anything that happened before that interview started in the hospital room is not directly relevant in the sense that it is not a part of, let's say, the actus reus of the offense. Yeah, but it started the ball rolling, didn't it? Correct. I mean, Wallach also started the ball rolling. She started the ball rolling when she was found and didn't say, hey, I was lost. She said I was kidnapped. So how do they not take that into consideration in their investigation, which began making the police officers incur expenses in an investigation, potentially could have had innocent people arrested if other things came out? I mean, aren't things relevant to the police officers? You're saying it's only that time that happened in the hospital. How are these other things not relevant? Well, that is what she is convicted of. I mean, she is convicted of statements and this whole case, when one looks at the constitutional argument that is presented in this case, this entire case has to do with restrictions on speech. So some of the questions that you're asking are more, I would submit that they are more pertinent regarding the constitutional claim. Let's move to your constitutional issue. OK, so regarding the constitutional issue, we rely very heavily on the United States Supreme Court decision in United States versus Alvarez. And we would submit that it is virtually a compendium of the considerations that are appropriate in determining the constitutionality of restrictions on speech and the criminalization of statements, of false statements. So it's an as-applied challenge. It is an as-applied challenge. We are not challenging the provision on its face. So we do not argue in the constitutional context. And, you know, as far as the way the court is framing some of its questions this morning, there is relevance then to the fact of what potentially this statute might cover or might legitimately cover. And those are proper considerations. But the question is, regarding the constitutionality now, is whether this statute legitimately covers the conduct that happens in this case. So if the court is familiar with the opinion, it knows that there's a four-person plurality and a two-person concurrence. And the only difference between those two segments of the justices has to do with the standard of review. But it does not have to do with this. Their differences are really not affecting the substance of the constitutional questions. And there are approximately four, depending how you read the opinion, but four considerations from Alvarez that are principles for determining constitutionality of the criminalization of false statements. And there are four principles, at least, from Alvarez that apply directly to our case. Does it specifically exempt false statements to government officials? No, it does not. And I would direct your honors attention as I was rereading the opinion for purposes of this morning's argument. And I noticed at page 735 of the U.S. reports, which is a part of the concurrence, it compares directly or argues directly regarding statutes that prohibit false statements concerning the commission of crimes. And the Supreme Court had this to say regarding that very specific question and its treatment in other cases. The Supreme Court said that those kinds of statutes require proof that substantial public harm be directly foreseeable or that the conduct is very likely to bring about the harm. So, I mean, there isn't any question but that there's not some sort of an exception for or a broad overall exception for statements made to public officials. Those are subject to some First Amendment analysis, as well as any other restrictions on speech are susceptible to First Amendment examination. The term report, is that a noun or a verb? That's a good question, Your Honor. I'm not sure, but I viewed it as a noun. Thank you. So you're relying on her statement not being not knowing or reckless, basically. Well, I don't know if I would say that. Are we talking about the First Amendment context now or are we talking about the reasonable doubt argument? Well, reasonable doubt and I think they kind of spill over into your First Amendment argument. I mean, she's not saying anything different. You're not saying anything different in the First Amendment argument than that you aren't saying in the beyond a reasonable doubt arguments. They're all kind of based on the same thing, aren't they? Well, they're based on the same underlying facts, but I don't see the law as being, you know, particularly identical. I mean, the question for... are the same arguments that she didn't mean to, you know, mislead the police or she didn't make the initial report. I mean, it was false speech. And as Justice Burkett said, any statement, I think I read Alvarez to saying any statement to any officer or somebody in the federal government is carved out of that exception in Alvarez. So that's why I'm saying the speech in the beyond a reasonable doubt argument, the same speech in the First Amendment argument is no different. Well, how is it not carved out? What makes her statement, what makes her false statement protected under Alvarez? The following points, I'll list them first, and then I can go back to them. But the following four principles, at least the unlimited scope of the application of the statute to the subject matter, the harm that is caused by the defendant's conduct, the causal link between the restriction and the injury to be prevented, and the sufficiency of counter speech to serve the government's purpose. And I'll just limit myself right now to that particular one, because it is the most apt and important of these principles for this case. Because as a constitutional matter, here's what happened in this case. Because Michelle talked a lot, and remember that I represent in the brief that my reading or listening to the audio of this meeting in the hospital room shows that the police in a half hour period asked 60 questions in a half hour period, at least 60 questions. They themselves admitted that those were 60, that those were leading questions. Michelle talked and answered these questions, cooperated with the police. And if you read that or listen to that audio, a few times as I have, and I'll assume that some of you may have, you can see that Michelle's story is just not holding together. And the point of the sufficiency of counter speech is whether or not counter speech is sufficient to serve the government's purpose in whatever it is criminalizing, such that there does not have to be a restriction on the defendant's free speech, or that there does not have to be such a harsh or stringent restriction on the defendant's free speech. And that is what the First Amendment is all about. Counselor, your time is up. Okay. Justice Burkett, do you have any other questions? No, thank you. Thank you. Ms. Perko, you'll have an opportunity to make rebuttal. Thank you, Your Honor. Ms. Harrington, you may proceed. Thank you, Your Honor. Good morning, Your Honors. Good morning, counsel. May it please the court. My name is Lynn Harrington, and I represent the people of the state of Illinois. Your Honors, I'd first like to touch on something that Ms. Perko talked about a lot in her first issue with regard to the conduct of the defendant while she sat in the hospital bed, talking to Detectives Tinsley and Murphy. Your Honor, that's not the focus here, because the fact that the statute at issue says that a defendant commits disorderly conduct when she knowingly transmits or caused to be transmitted in any way a report. What that means then is that when she was found in the field and she told Mr. Collins, oh, I've been the victim of an aggravated robbery, or not using those words, I've been kidnapped by masked men and one of them had a gun. That was it. That was her false story. And then when two or three days later, when she told Detective Murphy in tears, I'm sorry, I made it all up. I made it all up because I was being harassed. That's it. The offense is complete. All four elements have been met. I'd also like to touch on the council. I'm sorry. What is your response to Ms. Perko's statement that this is unconstitutional because of the lack of harm that Alvarez requires? Your Honor, I completely disagree with that. There is immense harm here. And as Justice Shostak properly noted, these two issues do bleed together a bit. And when we're talking about the standard for disorderly conduct and menacing the public, the exact same harm goes into a constitutional analysis here. What is the harm to the government? Wow. Let me start with the harm was Detective Tinsley and Detective Murphy being taken off their regular duties and getting on this case of where the defendant made this story up. And her boyfriend started by saying she was a missing person. So you had those two detectives. You had Sergeant Proce. He was also on the case. When she was found in the field, then you have Mr. Collins getting involved. All these government officials who have better things to do than to deal with the defendant who's making up stories about being abducted. You have at the scene of the field, several squad cars were called. The Richmond Fire Department was called. An ambulance was called. The defendant took up a bed in a hospital that could have been used perhaps for somebody else. All these resources were wasted. The defendant relies on the Stevens case regarding her conduct, having to cause the basically utmost possible harm. How do you distinguish the Stevens case that she relies on? Actually, I'm glad you brought that up, Your Honor, because you don't need to distinguish the Stevens case. It actually hurts the defendant's case. When she was saying earlier, I believe you asked her, does it have to be the defendant herself that reports this or can it be somebody else? In the Stevens case, it was the landlord. These two guys were yelling at each other and the landlord was like, what's going on here? The landlord, the woman, called the police. Then the detective came and found out that he made up a lie about the $450 and he had to go in. At the end, what the court was talking about with regard to the harm, Your Honor, they were saying that this is a menace to the public. In the defendant's brief, she talks about the fact that the court said this could have been an explosive situation because the officer had to go into an apartment that he believed there was an armed individual. However, if you read the entire paragraph, Your Honor, what it also says is that, hey, there's a lot of harm here. You took three police officers away from their job to come to this whole hoax. That's exactly what went on in this case, Your Honor. Look at how many people were involved and took away taxpayers' time and also government resources that could have better been spent solving crimes instead of investigating this hoax. Again, Your Honor, I would like to go back to the dictionary definition that defendant talks about of transmit and report. As you notice from my brief, I completely agree with the dictionary definitions. However, I do not agree with defendant's interpretation that a report must be something so elaborate or so formal. I mean, obviously, a report is a narrative. You submit that the report here was planned. I mean, it was planned out. This just wasn't something she just kind of made up when she was found by Mr. Collins. Oh, absolutely. Yes, Your Honor, I believe that it was planned out. When they also had to bother a judge to get a search warrant and the detectives went into her apartment, she planned what she's really screwed up on is making the apartment too neat. But she left her purse there. She left her wallet there. She left her clothes that her boyfriend said, that's what she was wearing the last time I saw her. They were on a pile on the floor. She had planned this whole thing out and the amount of harm that it caused. And of course, this was a menace to the public that the state has proven beyond a reasonable doubt. All four elements of this offense have been met. So now that we've talked about the first issue and it kind of does lead into the second, Ms. Perko heavily relies upon the Alvarez case. Can you distinguish the Alvarez case from the facts here? Absolutely, Your Honor. On the facts, Your Honor, first, I'd also like to mention Justice Burkett did ask Ms. Perko with regard to a speech, a false speech to a government official that is in the Alvarez decision, that that is prohibited and a proper restriction on First Amendment speech. But the Alvarez case is nothing like this case at all. It was dealing with the Stolen Valor Act and what that was, it was a law that made illegal anybody claiming that they had received a military medal or award. However, what the court said was, you can't regulate false speech for false speech alone. There was nothing else attached to it. Not even a requirement that the state would have to prove that the defendant uses, for example, for material gain. Here, this is completely different. This is a well settled, as it was noted in the Alvarez case, it's speech integral to criminal conduct. And that is why Alvarez itself sets out that. How do you respond to her fourth argument about the counter speech? Yeah, the counter speech, Your Honor, I'm not sure holds any water because as Ms. Perko brought up, you have to prove the false statements are very likely to bring about substantial harm. As I've mentioned several times, of course, they brought about very much substantial harm. And this isn't something like an Alvarez, they said, well, you can always make a fool of this guy. And then that would be maybe enough speech alone to be some sort of product of his false speech that he would become embarrassed. That's certainly not anything like this case whatsoever. No, it's a little different. But, you know, she does bring up the point that they asked her all of these questions, 61 questions. And at some point, they had to realize that this was not a true story, yet they continue. Your Honor, I'm not sure that they would be doing their jobs if they just looked at her and went, okay, this doesn't make any sense. They still had to act as detectives and investigate this case. And more importantly, Your Honor, a lot of this substantial harm had already occurred by the time she was in the hospital bed. All these people had been pulled away from their jobs and had to follow this hoax in this story to figure out what the heck was going on. The fire department had been called. She was already in the hospital. An ambulance had been called. Squad cars were there. The McHenry County Sheriff's Department was there. All that harm had already occurred by the time she got into the hospital and she was talking to Detectives Tinsley and Murphy. And as I already said, even if she hadn't decided to talk to the detectives, it didn't matter. It was done because she caused to be transmitted a report to them when she told Mr. Collins in the field that she had been abducted by armed, masked men. That's all it took. That and then a couple of days later when she told Detective Murphy that she had made it up. Your Honors, I just would like to point out the Illinois Supreme Court case of Inouye, B.C. It sets the standard here is destroying or menacing the public order and that we should look to the reasonableness or unreasonableness of the defendant's conduct. And certainly here, as I have shown, her conduct was completely unreasonable. That's all. One other question. Our standard of review on both of these issues is de novo, is it not? No, Your Honor. With regard to the elements of the offense, that is de novo. A statutory interpretation is always de novo. But because it's beyond a reasonable doubt, it is in the light most favorable to the prosecution, whether we have proven the elements of the offense. And we certainly have done that, Your Honor. I'm sorry, Justice McLaren, I interrupted you. My question was going to be. Yeah, you claim that the transmission was affected when the defendant told Mr. Collins that she had been kidnapped. But she told him not to call the police. So you're saying that her transmission was to the government employee Collins and not to the police? No, she was transmitting a report. I'm sorry. Was Collins a government employee? Yes, Your Honor. He was a government employee. But even if he were not a government employee, what the defendant was doing was transmitting a report and causing that report to be transmitted to Detectives Tinsley and Murphy. Well, if that's the case, then if and when they arrived, she could disavow or refuse to make any further comment. Would either or both of those constitute a withdrawal or a non-crime? Well, Your Honor, that would be up to the trier of fact, and that's just not what happened here. What she ended up doing is she ended up answering 60 questions of the detectives and getting herself into a worse and worse situation as she provided more details of this story. During the proceedings, throughout the proceedings, the defendant claimed that she had been molested by her father and grandfather. And was asking for a female lawyer or public defender to understand her predicament. Was there an attempt to get her into mental health court? I'm so sorry. I'm having a hard time hearing you, Justice Burkett. Throughout the proceedings, the defendant was claiming that she had been abducted or molested by her father and her uncle. And she wanted a female public defender who would understand her predicament. Was there an effort to get her a female attorney? Your Honor, I know there was a fitness hearing and there was a time that they made sure that the defendant was found fit before she was tried. Off the top of my head, I cannot remember if the public defender was a female or not, but I do know that she was found fit before she was tried. And she went through five lawyers, correct? She went through five lawyers? Five different attorneys. Yes, Your Honor. Yes. That's all. However, again, Your Honors, the evidence at trial was overwhelming that the state had proven the elements beyond a reasonable doubt that the defendant was guilty of disorderly conduct. And for that reason, we respectfully request that this court affirm the defendant's finding of guilty of disorderly conduct and find that the statute as applied to this case is not unconstitutional. Thank you, Your Honors. Are there any other questions? Well, I have just one question for Ms. Perko. Was there any attempt to have the defendant examined for an insanity defense? Does Ms. Perko get rebuttal? Yes, she does. And I figured I'd wait until she answered the question before I started the time. Go ahead, Ms. Perko. There was a fitness examination. There was a fitness hearing, but I would not know specifically. I'm not aware specifically that there was an investigation or an examination of her for purposes of the insanity defense. I mean, the two standards are not the same, fitness and insanity. My point is, it's not raised in your brief as ineffective assistance or trial counsel for failure to have her examined on insanity defense. Well, I didn't raise that issue. It's an interesting issue. I didn't raise it. I think it would be difficult to raise it on this record without knowing whether counsel examined that issue and made a decision. It would seem that it would have to be raised in a post-conviction where there would be more evidence. I don't think that the record reflects this, and certainly I did not raise an ineffective assistance of counsel argument. And offhand, I can't really say that categorically it couldn't have been raised on this record. She doesn't have post-conviction remedies available to the sentencing probation. Excuse me, Your Honor, I also am having a difficult time with hearing your transmission. Probation, so she will not have a need for a post-conviction remedy, correct? Right. I mean, that's what she received and is an issue. I acknowledge that. But I'm only addressing whether or not the record as it exists is sufficient to raise that argument. And I, you know, I even at this time, I have a lot of research in this case. I cannot offhand recall if I examine the insanity issue without looking at my own notes in this matter. Anything else? I'm a little confused about my rebuttal time. I have a couple of points I'd like to make. You have four minutes. Thank you, Your Honor. With reference to this discussion about the kidnapping hoax and the statements, I would submit to the court that this raises a considerable due process question as to what was being defended and what notice my client had of what and her counsel of what was being defended. What was being charged and defended in this case was statements made to a specific officer, and those statements occurred in the context of that one hour in the hospital room. Don't you look at the totality of the circumstances, though, Ms. Perko, as to what led to that? Is that not relevant? Or are you saying based upon the way the statute was, the defendant was charged were limited, the charge of fact was limited to what was said in that hospital room? The indictment limits it to statements given to one of the named officers, not to the conservation employee. So that's what the charges, that's what as a matter of due process, that's what the notification was in terms of defending the case. So I think that that point is important. With reference to distinguishing Alvarez or whether or not it is proper to criminalize false statements. Yes, false statements can be criminalized, but they can only be criminalized consistent with the constitutional protections that exist. And the constitutional protections that exist are those four or five that are discussed in my brief and that I enumerated from my notes this morning during this argument. There has to be either strict scrutiny, as the plurality in Alvarez said, of the propriety of the restriction on speech, or as the plurality said, there has to be proportionality review. Is the restriction proportional to the harm that the government is attempting to prevent by criminalizing the conduct? And for the reasons that we stated in our brief, and again, the reasons this morning, that test cannot be met. I also, you know, somewhat backtracking a bit on this kidnapping business, the boyfriend issue. I mean, there seems in the discussion to be a tendency to make my client responsible for conduct that her boyfriend did. There is simply not enough proof, nor was it charged, to make her responsible for, let's say, the missing persons false report. That's not what she's charged with. And, you know, while there may be some tangential relevance of these occurrences before the hospital room statements, I don't think that that connection is clear. And it certainly doesn't, it's not directly relevant, and it does not raise to the level of reasonable doubt of proof of guilt. I have a real quick question. I hate to open up a new can of worms, but you talked about the strict scrutiny standard. Is this a content-based restriction in speech or content neutral? No, it's content-based, I believe. Does it make any difference whether the report that was false reported a crime, as opposed to a situation where she merely stated something to the effect that she was given a ride and dropped off in a field and she doesn't remember what happened after that? Well, I mean, the particular statutory section requires that the false statement be the false statement about, you know, the commission of a crime. So that's integral. It's part of the elements of the offense. Any other questions? So for all the reasons, then, Your Honor, we ask for a reversal of the conviction. Thank you. The case will be taken under advisement and at disposition rendered in apt time. Thank you. Mr. Clerk, you may close the proceedings. Thank you, Your Honors. Thank you.